RECORD NO. 15-1522

In The

# United States Court Of Appeals
## For The Fourth Circuit

**SOUTHERN APPALACHIAN MOUNTAIN STEWARDS;
SIERRA CLUB; APPALACHIAN VOICES,**

*Plaintiffs – Appellants*,

v.

**RED RIVER COAL COMPANY, INC.,**

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT BIG STONE GAP

————————

## BRIEF OF APPELLANTS

————————

Isak J. Howell
LAW OFFICE
  OF ISAK HOWELL
117 East Washington Street, Suite 1
Lewisburg, WV  24901
(540) 998-7744

Benjamin A. Luckett
APPALACHIAN
  MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV  24901
(304) 645-0125

*Counsel for Appellants*

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1522__    Caption: __Southern Appalachian Mountain Stewards, et al. v. Red River Coal Co.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Southern Appalachian Mountain Stewards__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Benjamin A. Luckett    Date:    10/13/2015

Counsel for: Appellants

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on    10/13/2105    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Benjamin A. Luckett
(signature)

10/13/2015
(date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 15-1522    Caption: Southern Appalachian Mountain Stewards, et al. v. Red River Coal Co.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)


who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Benjamin A. Luckett          Date:  10/13/2015

Counsel for: Appellants

## CERTIFICATE OF SERVICE
****************************

I certify that on _____10/13/2105_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Benjamin A. Luckett                    10/13/2015
(signature)                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1522__    Caption: __Southern Appalachian Mountain Stewards, et al. v. Red River Coal Co.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Appalachian Voices__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Benjamin A. Luckett                    Date:    10/13/2015

Counsel for: Appellants

## CERTIFICATE OF SERVICE
**************************

I certify that on _____10/13/2105_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Benjamin A. Luckett                              10/13/2015
        (signature)                                    (date)

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF JURISDICTION...................................................1

STATEMENT OF THE ISSUES FOR REVIEW ....................................1

STATEMENT OF THE CASE...........................................................2

     Legal Framework ...............................................................5

     Statement of Facts ............................................................10

SUMMARY OF ARGUMENT .........................................................22

ARGUMENT .............................................................................23

    I.     Standard of Review ........................................................23

    II.    The District Afforded Undue Deference to DMLR's <u>Post Hoc</u>
          Interpretation of Red River's Permit...................................24

          a.     DMLR's Interpretation Lacks the Formality and
                Reasoned Basis Necessary for <u>Chevron</u>-level Deference.........25

          b.     DMLR's Interpretation is Not Due Deference as a
                Finding of Fact Within the Agency's Technical Expertise ......30

    III.    The Unambiguous Language of Red River's Permit and the
          South Fork Pound River TMDL Mandate Compliance With
          The TMDL's Individual WLAs .........................................32

    IV.    DMLR's Interpretation of Condition (n)(3) and the TMDL Is
          Unreasonable .................................................................34

          a.     DMLR's Interpretation Renders Portions of Condition
                (n)(3) and the TMDL's Individual WLAs Meaningless...........35

i

b.      DMLR's Interpretation Conflicts with the CWA's
        Requirements for Both TMDLs and NPDES Permits .............38

c.      DMLR's Interpretation Nullifies Important EPA
        Oversight Functions ..................................................................41

CONCLUSION ........................................................................................44

REQUEST FOR ORAL ARGUMENT ..................................................45

ADDENDUM OF PERTINENT STATUTES AND REGULATIONS ...........Add. i

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

American Canoe Ass'n, Inc. v. U.S. E.P.A.,
  54 F. Supp. 2d 621 (E.D. Va. 1999) ...............................................7

American Farm Bureau Federation v. U.S. E.P.A.,
  984 F. Supp. 2d 289 (M.D. Pa. 2013)........................................38, 41, 42, 43

Anacostia Riverkeeper, Inc. v. Jackson,
  798 F. Supp. 2d 210 (D. D.C. 2011)......................................passim

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)...............................................................24

Bowen v. Georgetown Univ. Hosp.,
  488 U.S. 204 (1988)...............................................................27

California Public Interest Research Group v. Shell Oil Co.,
  840 F. Supp. 712 (N.D. Cal. 1993)..............................................31

Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,
  273 F.3d 481 (2d Cir. 2001) adhered to on reconsideration,
  451 F.3d 77 (2d Cir. 2006) ........................................................26

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
  467 U.S. 837 (1984)............................................................25, 28

Christensen v. Harris Cnty.,
  529 U.S. 576 (2000)...............................................................26

Citizens for a Better Environment-California v. Union Oil Co. of California,
  83 F.3d 1111 (9th Cir. 1996) ("UNOCAL"), cert. denied,
  519 U.S. 1101 (1997) ...........................................................43-44

Citizens for Pennsylvania's Future v. Pittsburgh Water and Sewer Authority,
  13 F. Supp. 3d 493 (W.D. Pa. 2014) ...........................................30

Dioxin/Organochlorine Ctr. v. Clarke,
  57 F.3d 1517 (9th Cir. 1995) .......................................................................40

EPA v. California ex rel. State Water Res. Control Bd.,
  426 U.S. 200 (1976)........................................................................................5

FDIC v. Prince George Corp.,
  58 F.3d 1041 (4th Cir. 1995) .......................................................................32

Friends of Earth, Inc. v. E.P.A.,
  446 F.3d 140 (D.C. Cir. 2006)......................................................................40

Granutec, Inc. v. Shalala,
  139 F.3d 889 (4th Cir. 1998) .......................................................................27

In re Crystal Props., Ltd., L.P.,
  268 F.3d 743 (9th Cir. 2001) .......................................................................35

Klamath Water Users Protective Ass'n. v. Patterson,
  204 F.3d 1206 (9th Cir. 1999) .....................................................................32

Meadow Green-Wildcat Corp. v. Hathaway,
  936 F.2d 601 (1st Cir. 1991).........................................................................30

Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.,
  182 F.3d 904 (3d Cir. 1999), aff's sub nom.,
    Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.,
    20 F. Supp. 2d 700 (D. Del. 1998) .........................................................35

Natural Resources Defense Council, Inc. v. County of Los Angeles,
  725 F.3d 1194 (9th Cir. 2013) ............................................................32, 35, 40

Ohio Valley Environmental Coalition v. Hobet Mining, LLC,
  723 F. Supp. 2d 886 (S.D. W. Va. 2010) .......................................................6

Ohio Valley Environmental Coalition v. Miano,
  66 F. Supp. 2d 805 (S.D. W. Va. 1998) .........................................................6

Ohio Valley Environmental Coalition, Inc. v. Marfork Coal Co., Inc.,
  966 F. Supp. 2d 667 (S.D. W. Va. 2013) ......................................................32

iv

Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,
  674 F. Supp. 2d 783 (S.D. W. Va. 2009) .......................................30

Orthopaedic Hosp. v. Belshe,
  103 F.3d 1491 (9th Cir. 1997) .......................................................28

Perini Corp. v. Perini Construction, Inc.,
  915 F.2d 121 (4th Cir. 1990) .........................................................23

Piney Run Preservation Ass'n v.
County Com'rs of Carroll County, Maryland,
  268 F.3d 255 (4th Cir. 2001) ...................................................24, 32

Precon Dev. Corp. v. U.S. Army Corps of Engineers,
  633 F.3d 278 (4th Cir. 2011) .........................................................31

Pronsolino v. Nastri,
  291 F.3d 1123 (9th Cir. 2002) .........................................................8

Reno v. Koray,
  515 U.S. 50 (1995).........................................................................26

Reynolds Metals Co. v. U.S. E.P.A.,
  760 F.2d 549 (4th Cir. 1985) .........................................................30

Singh v. Clinton,
  618 F.3d 1085 (9th Cir. 2010) .......................................................26

Skidmore v. Swift & Co.,
  323 U.S. 134 (1944).................................................................26, 31

Son Broad., Inc. v. United States,
  52 Fed. Cl. 815 (2002)...................................................................30

Student Public Interest Research Group v. AT & T Bell Laboratories,
  617 F. Supp. 1190 (D.N.J.1985).....................................................31

United States v. Duke Energy Corp.,
  981 F. Supp. 2d 435 (M.D.N.C. 2013).............................................28

United States v. Ford Motor Co.,
    736 F. Supp. 1539 (W.D. Mo. 1990)............................................................28

United States v. Hoechst Celanese Corp.,
    128 F.3d 216 (4th Cir. 1997) ............................................................... 27-28

United States v. Mead Corp.,
    533 U.S. 218 (2001)...........................................................................26, 27

United States v. S. Indiana Gas & Elec. Co.,
    No. IP99-1692-CMF, 2002 WL 1760699 (S.D. Ind. July 26, 2002) ...... 28-29

United States v. Smithfield Foods, Inc.,
    191 F.3d 516 (4th Cir. 1999) .......................................................................44

Walsh v. Schlecht,
    429 U.S. 401, 97 S. Ct. 679, 50 L. Ed. 2d 641 (1977) ...................................41

**Statutes:**

28 U.S.C. § 1291 .....................................................................................................1

28 U.S.C. § 1331 .....................................................................................................1

33 U.S.C. §§ 1251 et seq. ("Clean Water Act") ..............................................passim

    CWA § 303 .....................................................................................................6

    CWA § 303(d) ..........................................................................................7, 8, 12

    CWA § 404 ...................................................................................................13

    CWA § 404(c)...............................................................................................13

33 U.S.C. § 1311(a) ................................................................................................5

33 U.S.C. § 1311(b)(1)(C) .......................................................................................9

33 U.S.C. § 1313(a) ................................................................................................7

33 U.S.C. § 1313(d) ................................................................................................7

33 U.S.C. § 1313(d)(1)(C) ................................................................7

33 U.S.C. § 1313(d)(2) ....................................................................7

33 U.S.C. § 1342 .............................................................................5

33 U.S.C. § 1342(b) .........................................................................5

33 U.S.C. § 1342(c)(2) .....................................................................6

33 U.S.C. § 1342(d) ........................................................................43

33 U.S.C. § 1362(14) ........................................................................8

33 U.S.C. § 1365 .............................................................................1

**Regulations:**

40 C.F.R. § 122.4(d) ...............................................................10, 39

40 C.F.R. § 122.41(a) ......................................................................5

40 C.F.R. § 122.44(d)(1)...............................................................9, 39

40 C.F.R. § 122.44(d)(1)(vii)(B) .........................................<u>passim</u>

40 C.F.R. § 122.62 ..........................................................................43

40 C.F.R. § 122.63 ..........................................................................43

40 C.F.R. § 123.25(a) .......................................................................6

40 C.F.R. § 123.43(a) ......................................................................43

40 C.F.R. § 123.44(a) ......................................................................43

40 C.F.R. § 123.44(b) ......................................................................43

40 C.F.R. § 123.44(h) ......................................................................43

40 C.F.R. § 130.0(b) .........................................................................7

40 C.F.R. § 130.2(d) ................................................................7

40 C.F.R. § 130.2(g) ................................................................8

40 C.F.R. § 130.2(h) ........................................................ passim

40 C.F.R. § 130.2(i) ................................................8, 33, 38

40 C.F.R. § 130.2(j) ................................................................7

40 C.F.R. § 130.7 ............................................................ passim

40 C.F.R. § 130.7(d) ..............................................................41

**Rules:**

Fed. R. App. P. 4(a)(1)(A) .....................................................1

Fed. R. Civ. P. 56(c) .............................................................24

**Other Authorities:**

50 Fed. Reg. 1775 (Jan. 11, 1985) .....................................42

Fecal Bacteria and General Standard Total Maximum Daily Load
Development for Callahan Creek, March 29, 2006, available at
deq.state.va.us/Programs/Water/WaterQuality InformationTMDLs/TMDL/
TMDLDevelopment/ApprovedTMDLReports.aspx
(last visited October 12, 2015)..............................................11

Final Determination of the U.S. Environmental Protection Agency Pursuant
to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine,
Logan County, West Virginia at 50 (2011), available at
http://water.epa.gov/lawsregs/guidance/cwa/dredgdis/spruce.cfm
(last visited October 12, 2015)......................................... 13-14

Restatement (Second) of Contracts § 203(a) (1981) ............................35

TMDL Reports for Garden Creek Watershed; Knox Creek and Paw Paw Creek; Russell Prater Creek; Callahan Creek Watershed; Dumps Creek Watershed; and Straight Creek, Stone Creek and Tributaries, available at http://deq.state.va.us/Programs/Water/WaterQuality InformationTMDLs/TMDL/TMDLDevelopment/ApprovedTMDLReports.a spx (last visited October 12, 2015) ................................................................passim

U.S. EPA, A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams (2011), available at http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=233809 (last visited October 12, 2015)................................................................14

U.S. EPA, Decision Rationale, Phased Total Maximum Daily Loads for the Aquatic Life Use (General Standard - Benthic) Impairments in the Pound River Watershed, Wise County, Virginia ("EPA Rationale")........................passim

US EPA, Clarification Regarding "Phased" Total Maximum Daily Loads, August 2, 2006, available at http://water.epa.gov/ lawsregs/lawsguidance/cwa/tmdl/tmdl_clarification_letter.cfm (last visited October 12, 2015)................................................................9

# STATEMENT OF JURISDICTION

Plaintiffs-Appellants Southern Appalachian Mountain Stewards, et al. (SAMS) brought this action against Defendant-Appellee Red River Coal Company, Inc. ("Red River") under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251 et seq. SAMS alleged that Red River is discharging pollutants from point sources at its surface coal mine in violation of the unambiguous terms of its Clean Water Act permit. Complaint, JA 7. The District Court had jurisdiction under 33 U.S.C. § 1365 (CWA citizen suit provision) and 28 U.S.C. § 1331 (federal question). The District Court issued a final order and judgment denying SAMS' motion for summary judgment and granting Red River's motion for summary judgment on all issues on April 14, 2015. Op. and Order, JA 510; Judgment, JA 522. SAMS filed a timely notice of appeal on May 13, 2015. Notice, JA 523; see Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES FOR REVIEW

Did the District Court improperly defer to a state agency's interpretation of a condition of Appellee's Clean Water Act permit requiring compliance with a Total Maximum Daily Load (TMDL) where that interpretation renders meaningless the TMDL's federally-mandated numeric pollution caps assigned to Appellee's facility, and where that interpretation was set forth in a private settlement

agreement reached with an industry interest group after both the issuance of Appellee's CWA permit and EPA's approval of the TMDL?

## STATEMENT OF THE CASE

This case hinges on the interpretation of a term of a permit issued pursuant to the Clean Water Act, 33 U.S.C. §§ 1251 et seq., that prohibits the permittee from discharging pollutants into waterways that are subject to a Total Maximum Daily Load (TMDL) unless those discharges are "made in compliance with the TMDL and any applicable TMDL implementation plan." NPDES Permit Conditions, JA 378. Appellee Red River's surface mining operation discharges to the South Fork of the Pound River, which is subject to an approved TMDL that places permit-specific numeric caps—known as wasteload allocations or "WLAs"—on the amount of the pollutants Total Dissolved (TDS) and Total Suspended Solids (TSS) that can be discharged from Red River's operations. South Fork Pound River TMDL ("TMDL"), JA 28; NPDES Permit 0081272, JA 386. The TMDL was required because the South Fork of the Pound River is not adequately supporting aquatic life as a result of TDS and TSS pollution. TMDL, JA 47–50.

SAMS brought a CWA citizen suit against Red River alleging that its discharges of TDS and TSS consistently and significantly exceeded the individual wasteload allocations assigned to Red River's operations by the TMDL, often by

more than a factor of 10, and thus are not "in compliance with the TMDL." Complaint, JA 7; TDS and TSS Load Calculations, JA 467. Following the District Court's denial of Red River's Motion to Dismiss for failure to state a claim, JA 423, the parties filed cross-motions for summary judgment. Red River Mot., JA 441; SAMS Mot., JA 464. The District Court denied SAMS' motion and granted Red River's motion, finding that the permit did not require compliance with the TMDL's permit-specific numeric WLAs. Op. and Order, JA 510; Judgment, JA 522.

The Court reached its ruling by deferring to the Virginia Department of Mines, Minerals, and Energy, Division of Mined Land Reclamation's (DMLR) interpretation of the permit condition requiring compliance with the TMDL. DMLR's interpretation was first set forth in a private settlement agreement reached with the Virginia Mining Issues Group (VMIG), an unincorporated industry association, nearly two years after the issuance of Red River's permit and nearly a year after approval of the TMDL by the U.S. Environmental Protection Agency (EPA). VMIG Settlement, JA 363. Unlike the permit and TMDL, the settlement was not subject to review by EPA or the public. According to DMLR affidavits submitted in support of Red River's Motion for Summary Judgment that apply the VMIG Settlement,  the condition in Red River's permit mandating that discharges be made "in compliance with the TMDL" does not mean that the discharges have

to comply with the numeric WLAs specifically assigned to Red River's permit in the TMDL. Rather, under DMLR's so-called "transient/aggregate approach," each permittee's individual discharges are measured only against the total wasteload allocation for the entire watershed. <u>See</u> O'Quinn Declaration, JA 449–50. Furthermore, even exceedances of the total watershed allocation do not constitute permit violations but only allow DMLR to request that the permittee institute certain unspecified "best management practices" (BMPs) in an attempt to reduce pollution loads. <u>Id.</u>

Despite the fact that DMLR's "transient/aggregate" approach ignores the TMDL's permit-specific individual WLAs and at no point requires a permittee to be "in compliance" with any numeric limitation, the District Court deferred to the agency's interpretation. Op. and Order, JA 519–20. The Court found that DMLR's interpretation of Red River's NPDES permit was due "special deference" as a product of the agency's "particular technical expertise" and should not be upset absent a finding that the agency violated federal law. <u>Id.</u> The Court thus concluded that Red River's discharges of TDS and TSS that exceeded the TMDL's permit-specific WLAs by more than a factor of ten did not constitute violations of the permit condition requiring such discharges to be made "in compliance" with the TMDL.

## Legal Framework

**The NPDES Program.** This action arises under the Clean Water Act, which Congress passed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act's primary mechanism for achieving that goal is Section 301's prohibition on the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit. Id. § 1311(a). One such permit is a National Pollution Discharge Elimination System ("NPDES") Permit. Id. § 1342. NPDES permits "transform generally applicable effluent limitations and other standards including those based on water quality into the obligations . . . of the individual discharger." EPA v. California ex rel. State Water Res. Control Bd., 426 U.S. 200, 205 (1976). "In short, the [NPDES] permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the [CWA]." Id. All NPDES permit conditions are enforceable. See 40 C.F.R. § 122.41(a).

The CWA authorizes EPA to delegate to a state the authority to administer its own NPDES program for discharges within its borders. 33 U.S.C. § 1342(b) (authorizing a state to "administer its own permit program" after EPA approval). In Virginia, the Division of Mined Land Reclamation ("DMLR") within the Department of Mining, Minerals and Energy ("DMME") issues NPDES permits for most coal mining operations in the state. Virginia's NPDES program, and its

authority to issue NPDES permits, did not become effective until it was approved

by EPA.  After a state assumes primacy for the CWA permitting program, its

program "shall at all times be in accordance with" the federal NPDES

requirements. 33 U.S.C. § 1342(c)(2).  "The federal NPDES program allows a state

to take control of the permitting process within its borders, so long as it complies

with the federal standards set forth by the Clean Water Act and the regulations

promulgated under that act."  Ohio Valley Environmental Coalition v. Miano, 66

F. Supp. 2d 805, 807 (S.D. W. Va. 1998) (emphasis added).  "To maintain primacy

over the permitting process, the State must comply with all applicable federal

laws."  Id.; see also Ohio Valley Environmental Coalition v. Hobet Mining, LLC,

723 F. Supp. 2d 886, 902 (S.D. W. Va. 2010) ("Under the CWA, state regulations

are incorporated into the unitary federal enforcement scheme, with federal

provisions remaining in effect." (quotations and citations omitted)); 40 C.F.R. §

123.25(a) (expressly applying EPA's NPDES permitting requirements to state

NPDES permit programs and mandating that State programs "must be

administered in conformance with" those requirements). Thus, the CWA remains

the applicable federal law in primacy states and controls the enforceability of

NPDES permit limits.

**Water Quality Standards and TMDLs.** Section 303 of the CWA requires

states to adopt ambient water quality standards, which consist of a designated use

for a waterbody and a numeric or narrative criterion designed to protect that designated use. 33 U.S.C. § 1313(a); 40 C.F.R. § 130.2(d). "Water quality standards (WQS) are the State's goals for individual water bodies and provide the legal basis for control decisions under the Act." 40 C.F.R. § 130.0(b). Under section 303(d) of the Act, states are required create a list,  known as a "303(d) list," of waters within their boundaries that are not meeting the water quality standards, known as "impaired" or "water quality limited" waters. See 33 U.S.C. § 1313(d); 40 C.F.R. § 130.2(j).

Along with the 303(d) list, states must develop a "total maximum daily load" (TMDL) for each pollutant that is causing impairment. Every TMDL "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." Id., § 1313(d)(1)(C).  Both the 303(d) list and the TMDLs must be submitted to EPA for approval and EPA must make a decision to approve or disapprove within 30 days. Id., § 1313(d)(2); 40 C.F.R. § 130.7. If it disapproves a TMDL, EPA is to develop its own TMDL within 30 days after such disapproval. Id.; see also American Canoe Ass'n, Inc. v. U.S. E.P.A., 54 F. Supp. 2d 621, 626 (E.D. Va. 1999) ("[T]he CWA and its implementing regulations envision a federal-state cooperative process of TMDL development in which EPA is an active

participant."); <u>Anacostia Riverkeeper, Inc. v. Jackson</u>, 798 F. Supp. 2d 210, 214–17 (D. D.C. 2011) (describing process for adoption of water quality standards, 303(d) lists, and TMDLs).

A TMDL establishes the "specified maximum amount of a pollutant which can be discharged or 'loaded' into the waters at issue from all combined sources," while still attaining water quality standards. <u>Pronsolino v. Nastri</u>, 291 F.3d 1123, 1128 (9th Cir. 2002). EPA defines a TMDL to be the sum of "Load Allocations (LAs)" for non-point source and background pollution and "Wasteload Allocations (WLAs)" for point sources of pollution.[1] 40 C.F.R § 130.2(i). A LA is the portion of a receiving water's loading capacity that is attributed to existing or future nonpoint sources of pollution or to natural background sources. <u>Id.</u>, § 130.2(g). A WLA is the portion of the waterbody's loading capacity that is allocated to an existing or future point source discharge and represents the maximum amount of pollution that source can discharge without causing violations of water quality standards. <u>Id.</u>, § 130.2(h). As the District Court for the District of Columbia explained in <u>Anacostia Riverkeeper</u>, the "core requirement of any TMDL is to divide sources of contamination along the water body by specifying load allocations, or LAs, to predict inflows of pollution from particular non-point

---

[1] The CWA defines "point source" pollution as pollution emanating from "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). Non-point source pollution is not defined but is understood to refer to any diffuse pollution that does not flow from a discrete conveyance.

sources; and to then set[] wasteload allocations, or WLAs, to allocate daily caps among each point source of pollution." 798 F. Supp. 2d at 248–49.

EPA guidance interprets the CWA to allow states to adopt "phased" TMDLs. According to EPA, phased TMDLs are appropriate in "situations where limited existing data are used to develop a TMDL and the State believes that the use of additional data or data based on better analytical techniques would likely increase the accuracy of the TMDL load calculation and merit development of a second phase TMDL." US EPA, Clarification Regarding "Phased" Total Maximum Daily Loads, August 2, 2006, available at http://water.epa.gov/ lawsregs/lawsguidance/cwa/tmdl/tmdl_clarification_letter.cfm (last visited October 12, 2015). Although phased TMDLs are developed with the understanding that they are likely to be revised upon the collection of additional data, such TMDLs must nevertheless "include all elements of a regular TMDL, including load allocations, wasteload allocations and a margin of safety. As with any TMDL, each phase must be established to attain and maintain the applicable water quality standard." Id.

**Water Quality-Based Effluent Limits.** The Clean Water Act and its regulations require that NPDES permits include "technology-based" effluent limitations as well as any more stringent limitation necessary to ensure compliance with water quality standards. 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1).

9

EPA's regulations strictly prohibit the issuance of an NPDES permit if "the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States." 40 C.F.R. § 122.4(d).

As explained above, WLAs prescribe the maximum amount of pollution that a point source can discharge without exceeding the TMDL and causing a violation of water quality standards. Thus, NPDES permits for discharges in TMDL watersheds must include water quality-based effluent limits that are "consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 C.F.R. 130.7." 40 C.F.R. § 122.44(d)(1)(vii)(B). EPA's regulations state that WLAs "constitute a type of water quality-based effluent limitation." 40 C.F.R § 130.2(h).

## Statement of Facts

**Virginia's Early Coalfield TMDLs.** Prior to 2010, Virginia submitted and EPA approved six TMDL reports involving TDS pollution in coal mining watersheds. Each of those TMDLs explicitly stated that they were developed using a "transient/aggregate" approach. See TMDL Reports for Garden Creek Watershed; Knox Creek and Paw Paw Creek; Russell Prater Creek; Callahan Creek Watershed; Dumps Creek Watershed; and Straight Creek, Stone Creek and Tributaries, available at http://deq.state.va.us/Programs/Water/WaterQuality InformationTMDLs/TMDL/TMDLDevelopment/ApprovedTMDLReports.aspx

(last visited October 12, 2015). Under that approach, instead of assigning

individual wasteload allocations to each point source of pollution, the DMME

treated the discharges like non-point sources. See, e.g., Fecal Bacteria and General

Standard Total Maximum Daily Load Development for Callahan Creek, March 29,

2006, at10-2, available at deq.state.va.us/Programs/Water/WaterQuality

InformationTMDLs/TMDL/ TMDLDevelopment/ApprovedTMDLReports.aspx

(last visited October 12, 2015) ("The NPDES permits associated with surface

mining in theis [sic] watershed was modeled as [non-point source] loads since a

runoff event is required to deliver pollutants to the stream from these sources.").

DMME assigned a single aggregate load for all mining point sources in the

watersheds and "no attempt was made to determine specific load reduction

requirements for specific sources." Id. at 10-4–10-5. DMME justified this approach

by contending that all surface mining point source discharges are "transient"

because the point source discharge ponds would be removed upon completion of

full reclamation of the mine and new discharge ponds would be installed at new

operations.  Id. at 10-4–10-5. DMME deferred development of individual

wasteload allocations and the pollution reductions needed to meet those allocations

until more data could be collected. Id. at 10-5 ("The waste load allocation was thus

established based on overall reductions for the watershed. This approach

established an equitable WLA and LA but did not establish a required reduction

from permitted sources. At this time, there is not enough water quality and other data on the permitted sources to calculate or model with confidence an existing TDS loading for these facilities.").

**The Pound River TMDL.** The Pound River was originally listed as impaired on Virginia's 1994 Total Maximum Daily Load Priority List and Report, developed pursuant to CWA § 303(d), due to violations of the general narrative aquatic life use (benthic) water quality standard. TMDL, JA 71. Violations of the narrative aquatic life water quality standard are based on failing scores on the Virginia Stream Condition Index (VaSCI), which measures health of aquatic life populations in streams. Id., JA 49–50. A 1998 Consent Order between EPA and the Commonwealth of Virginia mandated that TMDLs be developed for the Pound River and several other watersheds by May 2010. Id., JA 71.

On April 19, 2010, the Virginia DMME submitted a draft TMDL for aquatic life use impairment for the Pound River watershed to the EPA for review, which included separate Total Maximum Daily Load calculations for the North Fork Pound River, South Fork Pound River, and Phillips Creek. TMDL, JA 231–36. On April 12, 2011, DMME submitted an amendment of the earlier Pound River TMDL to EPA. TMDL, JA 228. The TMDL was submitted as a "phased" TMDL due to "uncertainties in representing mining sources in preliminary modeling and the subsequent load allocations." See U.S. EPA, Decision Rationale, Phased Total

12

Maximum Daily Loads for the Aquatic Life Use (General Standard - Benthic)

Impairments in the Pound River Watershed, Wise County, Virginia ("EPA

Rationale"), JA 398, 412–13; TMDL, JA 42. The TMDL stated that a revised

"Phase II" TMDL would be submitted within two years of EPA approval of the

Phase I TMDL. TMDL, JA 42; EPA Rationale, JA 413–14. In the interim, the

TMDL was to be fully effective. EPA Rationale, JA 404 ("A phased TMDL has

several stringent requirements, including all the major requirements of a completed

non-phased TMDL."). EPA Region III approved the amended TMDL on April 28,

2011. EPA Rationale, JA 398.

The South Fork Pound River TMDL identifies Total Suspended Solids

(TSS) and Total Dissolved Solids (TDS) as the primary pollutants, or "stressors,"

causing aquatic life impairment. TMDL, JA 49–50. The TMDL identifies

extensive active and historical coal mining discharges as the primary sources of

TSS and TDS in the watershed.[2] Id.

---

[2] TSS and, particularly, TDS pollution from surface coal mining operations is not unique to the Pound River watershed but is part of a widespread water quality problem impacting the Appalachian coal mining region. The U.S. EPA, in its determination to veto a CWA § 404 "dredge and fill" permit needed for a large proposed surface coal mine in West Virginia, explained that "[w]ater quality downstream of valley fills and in sediment ditches in mined areas is typically degraded due to high concentrations of solutes [including TDS], primarily because it has percolated through mine spoil." Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia at 50 (2011), available at http://water.epa.gov/lawsregs/guidance/cwa/dredgdis/spruce.cfm (last

In a significant departure from the earlier coalfield TMDLs, the Pound River

TMDL does not employ an "aggregate" wasteload allocation for all mining

sources, but rather sets daily and annual individual WLAs for each NPDES permit

in the watershed, including several of Red River's permits. Additionally, in

contrast to the earlier TMDLs that did not require any specific reductions from

permitted sources, the Pound River TMDL states clearly that:

> All Waste Load Allocations in this TMDL will be effective and
> implemented by DMLR. EPA regulations require that an approvable
> TMDL include individual WLAs for each point source. According to
> 40 CFR '122.44(d)(1)(vii)(B), Effluent limits developed to protect a
> narrative water quality criterion, a numeric water quality criterion, or
> both, shall be consistent with assumptions and requirements of any
> available WLA for the discharge prepared by the state and approved
> by EPA pursuant to 40 CFR '130.7.

TMDL, JA 43 (emphasis added); id., JA 197 ("DMLR's joint SMCRA/NPDES

permits are made consistent with approved coalfield TMDLs."). EPA echoed that

statement in its Decision rationale approving the TMDL:

---

visited October 12, 2015). EPA's research shows that mining discharges "increase
adverse impacts to water quality and wildlife, especially from total dissolved
solids . . . ." Id., Appendix 1 at 1; see also id. Appendix 6 at 4 ("The peer-reviewed
literature now reflect a . . . growing concern about the adverse ecological effects of
mountaintop mining, specifically with regard to the effects of elevated levels of
total dissolved solids."). EPA has deemed this problem significant enough to invest
considerable resources to develop a robust, peer-reviewed scientific document that
establishes a clear causal link between TDS pollution, measured as "conductivity,"
and aquatic life harm and sets a safe level for that pollution. U.S. EPA, A Field-
Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams
(2011), available at http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=233809
(last visited October 12, 2015).

14

> For the WLA component of this TMDL, EPA regulations require that an approvable TMDL include individual WLAs for each point source. According to 40 CFR § 122.44(d)(1)(vii)(B), "Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with assumptions and requirements of any available WLA for the discharge prepared by the state and approved by EPA pursuant to 40 CFR § 130.7." In this TMDL, all WLAs will be effective and implemented by the Division of Mined Land Reclamation (DMLR) through the NPDES permit program.

EPA Rationale, JA 413.

DMME's fundamental change of course from its earlier "aggregate" approach appears to have been motivated by feedback supplied by EPA during the TMDL development process. See EPA Rationale, JA 412 ("Once submitted to review, significant revision requests pertaining to the phased TMDLs required that the report be revised."). Prior to EPA's approval of the TMDL, DMME submitted a draft dated April 8, 2010 to EPA for review. EPA made suggested revisions to that document and returned it to DMME in August of 2010. See EPA Revisions of DMME Draft of TMDL ("EPA Revisions"), JA 474. Those revisions demonstrate that DMME originally attempted to put off implementation of the individual WLAs until the "Phase I" TMDL was revised and a "Phase II" TMDL was approved, but that EPA rejected that approach.

For instance, Page 2 of the draft TMDL's preface originally stated that "Implementation by DMLR of any wasteload allocation for pollutants identified in the draft reports will be pending approval and adoption of the revised TMDL."

EPA Revisions, JA 477. In its revisions, EPA struck that statement and replaced it

with the following passage:

> All Waste Load Allocations in this TMDL will be effective and
> implemented by DMLR. EPA regulations require that an approvable
> TMDL include individual WLAs for each point source. According to
> 40 CFR '122.44(d)(1)(vii)(B), Effluent limits developed to protect a
> narrative water quality criterion, a numeric water quality criterion, or
> both, shall be consistent with assumptions and requirements of any
> available WLA for the discharge prepared by the state and approved
> by EPA pursuant to 40 CFR '130.7.

Id.; see also id., JA 480, 485 (EPA commenting that the TMDL "need[s] daily

loads for each permittee"). The Final TMDL that was provided to the public and

approved by EPA adopts EPA's revision. TMDL, JA 43.

Similarly, the section titled "Phased TMDLs" originally included a

statement that "[d]uring the two year phased TMDL revision period,[3] DMLR will

implement the same process that the agency has used in other TMDL watersheds –

except that, because the phased process will examine wasteload allocations (WLA)

in the TMDLs, the WLA values included in the 'phased' documents will not be

used." EPA Revisions, JA 486. Again, EPA struck that passage and replaced it

with a statement that "Federal regulations also require that all new or revised

National Pollutant Discharge Elimination System (NPDES) permits must be

---

[3] Although the TMDL and EPA's Decision Rationale called for a revised "Phase
II" TMDL within two years of EPA approval of the "Phase I" TMDL, more than
four years has now passed and no revised TMDL has been officially submitted to
or approved by EPA.

16

consistent with the assumptions and requirements of any applicable TMDL WLA." Id., JA 486–87. EPA added a comment in the margin explaining that each "WLA must be implemented" and that DMME could "not ignore the WLA until the revised TMDL." Id., JA 487. The final version of the TMDL that was approved by EPA does not contain DMME's original statement. Id., JA 197.

In comments submitted to DMME on the amended Pound River TMDL, the Virginia Mining Issues Group expressed dismay that the TMDL's language and inclusion of individual WLAs was inconsistent with the transient/aggregate approach used in previous TMDLs. See VMIG Comments on Pound River TMDL, JA 245. VMIG commented that the TMDL amendments "present individual WLAs for individual point sources, taking the TMDLs to a level of detail beyond any of Virginia's existing coalfield TMDLs." Id. In an apparent attempt to prevent the coal industry from having to comply with the individual WLAs until a Phase II TMDL was approved, VMIG suggested that DMME include in the TMDL language explicitly stating that the TMDL's individual "wasteload allocations for [TSS and TDS] will not be . . . incorporated into individual mining permits." Id., JA 245–46. As with DMME's attempts to neuter the impact of the federally-mandated individual WLAs in its initial draft of the TMDL, VMIG's suggested language was not included in the TMDL document that EPA approved. Rather, the

17

TMDL mandated that "[a]ll Waste Load Allocations in this TMDL will be effective." JA 43.

**VMIG Challenge and Settlement.** Following EPA's approval of the amended Pound River TMDL, VMIG brought suit against the Virginia Department of Environmental Quality, State Water Control Board, and the DMLR in the Circuit Court for the City of Richmond. VMIG Settlement, JA 364. VMIG's suit appealed the amendments to the Pound River TMDL and the Bull Creek TMDL, both of which included effective individual WLAs for coal mining permittees. Id.

VMIG voluntarily dismissed its case after the parties entered a private settlement agreement[4] signed by their counsel on April 16, 2012. That settlement purported to reach back and alter the assumptions underlying the recent coalfield TMDLs that were submitted to and approved by EPA. In contrast to the clear, EPA-mandated statements in the TMDL that all of the individual WLAs would "be effective and implemented by DMLR" and that effluent limits in NPDES permits would need to be consistent with those WLAs, JA 43, the settlement stated that:

> All the mining wasteload allocations included in the Bull Creek and South Fork of the Pound River TMDLs, and calculated by the Division's contractor, were developed with the assumption that they would be applied under the agency's existing transient/aggregated permitting approach. To apply them to permit limitations as individual wasteload allocations would be inconsistent with the assumptions made during TMDL development.

---

[4] The agreement is not a judicially-approved consent decree and, as a private settlement, does not carry the imprimatur of the Virginia courts.

VMIG Settlement, JA 365. The settlement thus claims to accomplish through a private agreement that was not subject EPA oversight precisely what EPA prohibited Virginia doing in the TMDL development process, that is, avoiding implementation of the TMDL's individual WLAs.

**Red River's Permit and Discharges.** The pollution discharges that are the subject of SAMS' CWA citizen suit result from surface coal mining operations at Red River's Flat Gap Mine in Wise County, Virginia.[5] Pollutant discharges from that mine are regulated by Virginia NPDES Permit 0081272, most recently reissued by the DMLR on April 22, 2010. See NPDES Permit 0081272, JA 384.[6] That permit consists of a Fact Sheet, Effluent Limitations Table, two Memos from DMLR regarding compliance monitoring requirements in TMDL watersheds, and a set of standard NPDES Conditions that are applicable to all of DMLR's permits.

---

[5] SAMS' Complaint alleged violations at four different Red River mines. Complaint, JA 15–19. During the course of litigation, however, DMLR determined that three of the mines had completed reclamation and thus released the NPDES permits for those mines. SAMS thus pursued only the violations at the remaining NPDES-permitted mine in its Motion for Summary Judgment. See Op. and Order, JA 510 n.1.

[6] DMLR utilizes a combined system for its Coal Surface Mining Operation (CSMO) permits and NPDES permits, such that coal mining facilities are generally identified by both their CSMO and NPDES permit numbers. The NPDES permit documents and conditions, however, are separate from the CSMO permit documents and conditions. All references here are to the NPDES number, although the Complaint identifies both the CSMO and NPDES numbers and the South Fork Pound River TMDL identifies operations by their CSMO number. The last four digits of each are generally the same for any operation.

Id., JA 385. The standard DMLR NPDES Conditions include Condition (n)(3), which states that the "discharge of any pollutant(s) from this facility that enters into a water body with an existing and approved Total Maximum Daily Load (TMDL) must be made in compliance with the TMDL and any applicable TMDL implementation plan." NPDES Permit Conditions, JA 378. Permit 0081272's cover letter states explicitly that "[p]ermits with NPDES discharges located in Total Maximum Daily Load (TMDL) watersheds are required to discharge in accordance with mining waste load allocations set forth in the appropriate TMDL report for the watershed as stated in the standard NPDES Permit Conditions." NPDES Permit 0081272, JA 384 (emphasis added).

Outfall 006T on Permit 0081272 discharges to the South Fork Pound River, which is subject to an existing and approved TMDL. See NPDES Permit 0081272, JA 389. The South Fork Pound River TMDL assigns individual, numeric daily and annual wasteload allocations to Permit 0081272. TMDL, JA 231–32, 235–36 (assigning annual TSS WLA of 4.23 tons, daily TSS WLA of 0.0116 tons, annual TDS WLA of 177,579 kg, and daily TDS WLA of 487 kg).[7] Those WLAs represent the maximum amounts of pollutants that can be discharged if the South Fork Pound River is to support a healthy aquatic life community.

---

[7] The TMDL lists WLAs by CSMO permit number. Listed permit CSMO 1101272 is associated with NPDES Permit 0081272. See NPDES Permit 0081272, JA 384.

According to the Discharge Monitoring Reports (DMRs) submitted by Red River to DMME, Outfall 006T on Permit 0081272 regularly discharges TSS and TDS loads that far exceed the WLAs assigned to it by the South Fork Pound River TMDL. See TDS and TSS Load Calculations, JA 467–72.  Red River exceeded its daily TSS WLAs on thirty occasions between August 2012, when Outfall 006T began discharging, and December 2014. It exceeded its annual TSS WLAs in both 2012 and 2013. Most egregious are Red River's exceedances of its TDS WLAs. The discharges from Outfall 006T have exceeded the daily TDS WLA for Permit 0081272 on every day since TDS monitoring began in March 2013, amounting to 72 exceedances. Those daily discharges exceed the WLA by a minimum of a factor of five and up to nearly a factor of 100. In both 2013 and 2014, Red River discharged more than twenty-nine times the amount of TDS allowed by its annual WLA. Id., JA 470–72.

Red River's TDS discharges exceed not only the individual WLAs assigned to its permit but in fact the entire total maximum load for all point and non-point sources of TDS pollution in the South Fork Pound River watershed. The total annual allocation for all point and non-point sources of TDS in the South Fork Pound River TMDL is 5,026,715 kg. In 2013, Red River's discharges from Permit 0081272 added 5,298,963.6 kg of TDS to the watershed. TDS and TSS Load Calculations, JA 470. In 2014, its annual TDS load amounted to an astounding

21

6,935,690.9 kg. Id., JA 472. This single permit alone thus consistently discharges more TDS than Virginia and EPA determined could be accepted by the entire South Fork Pound River watershed without causing harm to aquatic life and violations of water quality standards. DMLR nevertheless somehow considers Red River to be in compliance with the term of its permit mandating compliance with the TMDL. O'Quinn Declaration, JA 450.

## SUMMARY OF ARGUMENT

In holding that Red River's TDS and TSS discharges did not violate its NPDES permit, the District Court deferred to DMLR's interpretation of the permit and the South Fork Pound River TMDL. SAMS contends that the DMLR's post hoc interpretation was not due the high level of deference afforded by the District Court. Instead, Red River's permit and the TMDL should be read according to their plain language to require compliance with the permit-specific individual wasteload allocations in the TMDL.

The District Court erred by affording the level of deference reserved for formal agency interpretations or highly-technical scientific findings of facts to what is essentially an agency litigation position. The interpretation that DMLR asserts in this case—that its former "transient/aggregate" approach to coalfield TMDLs continues to apply to newer TMDLs that contain individual wasteload allocations—was first put forth in a private settlement agreement with an industry

22

interest group and has never been formally adopted into a regulation or official guidance document. The interpretation is a purely legal question that does not involve the agency's technical expertise. Under U.S. Supreme Court precedent, such an interpretation is due limited deference, particularly where, as here, the state agency's interpretation conflicts with clear statements from the federal agency with oversight authority for the underlying statutory scheme.

Even affording the level of deference appropriate for formal agency pronouncements, DMLR's interpretation must be rejected as unreasonable. The plain language of Red River's NPDES permit and the South Fork Pound River TMDL require compliance with the TMDL's permit-specific individual wasteload allocations. DMLR's assertion that compliance with the permit can be determined by comparing the permittee's discharges solely to the aggregate wasteload allocation for the entire watershed renders the individual WLAs meaningless. The interpretation to which the District Court deferred ensures that the South Fork Pound River TMDL will not be achieved and that the river will continue to be impaired for the foreseeable future.

## ARGUMENT

### I.    Standard of Review

The Court reviews the District Court's grant of summary judgment de novo. Perini Corp. v. Perini Construction, Inc., 915 F.2d 121, 123 (4th Cir. 1990).  A

party is entitled to summary judgment when it shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any factual matter in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). To survive a motion for summary judgment, however, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" Id. at 256.

This Court reviews the District Court's interpretation of an NPDES permitting according to contract principles de novo. Piney Run Preservation Ass'n v. County Com'rs of Carroll County, Maryland, 268 F.3d 255, 269 (4th Cir. 2001).

## II.    The District Afforded Undue Deference to DMLR's Post Hoc Interpretation of Red River's Permit

The District Court ruled that Red River's NPDES permit that requires discharges to TMDL watersheds to "be made in compliance with the TMDL" did not require compliance with the numeric WLAs specifically assigned to that permit by the TMDL. Op. and Order, JA 511–13. It did so despite DMLR's statement in the permit's cover letter that "[p]ermits with NPDES discharges located in Total Maximum Daily Load (TMDL) watersheds are required to discharge in accordance with mining waste load allocations set forth in the appropriate TMDL." NPDES Permit 0081272, JA 384.

In ruling that the permit did not mean what it said, the Court afforded an extreme level of deference to DMLR's tortured, after-the-fact interpretation of the permit, which stated that TMDLs with individual WLAs are implemented in NPDES permits with no regard for those WLAs but only for the entire watershed's "aggregate" WLA. That interpretation was embodied in an affidavit from a DMLR employee submitted in support of Red River's Motion for Summary Judgment. Op. and Order, JA 517–20. The DMLR employee's affidavit adopted the interpretation set forth in the private settlement agreement reached with the Virginia Mining Interest Group. O'Quinn Declaration, JA 448–55; supra at 18–19. The Court found that DMLR's interpretation was due "special deference" as a product of the agency's "particular technical expertise" and should not be upset absent a finding that the agency violated federal law. Op. and Order, JA 519–20. The District Court erred by affording the level of deference that is due formal statutory interpretations and complex technical findings of fact to what is nothing more than a post hoc litigation position taken by DMLR.

> a.    DMLR's Interpretation Lacks the Formality and Reasoned
>        Basis Necessary for Chevron-level Deference

Under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), federal courts are to defer to an agency's interpretation of an ambiguous statute that Congress has entrusted it to implement as long as that interpretation is reasonable. Such deference to an agency's interpretation is only

appropriate, however, where the interpretation carries "the force of law."

Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000). Agency interpretations

warranting that high level of deference must be the product of "relatively formal

administrative procedure tending to foster the fairness and deliberation that should

underlie a pronouncement of such force," which procedure most often takes the

form of notice and comment rulemaking. United States v. Mead Corp., 533 U.S.

218, 227–31 (2001). Interpretations that are not the product of such formal

procedures are afforded deference only to the extent that they have the "power to

persuade." Christensen, 529 U.S. at 587 (quoting Skidmore v. Swift & Co., 323

U.S. 134, 140 (1944)); Reno v. Koray, 515 U.S. 50, 61 (1995) (internal agency

guideline that is not "subject to the rigors of the Administrative Procedure Act,

including public notice and comment," is entitled only to "some deference"

(internal quotation marks omitted)); Singh v. Clinton, 618 F.3d 1085, 1091 (9th

Cir. 2010) ("Even in the presence of ambiguity, however, we do not apply

controlling deference to an agency decision lacking precedential value. In such

cases the agency's determination is due only respect based on the persuasiveness of

the decision." (internal quotation marks and citations omitted)); Catskill Mountains

Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 490–91 (2d

Cir. 2001) adhered to on reconsideration, 451 F.3d 77 (2d Cir. 2006) (finding that

an agency interpretation expressed in "a series of informal policy statements" and

"consistent litigation positions" was due deference only to the extent that it has the power to persuade).

Here, DMLRs interpretation that TMDLs with individual WLAs are implemented in the same way as the agency's older TMDLs that contain only watershed-wide "aggregate" WLAs is nothing more than a litigation position. It lacks any of the formality and indicia of careful agency consideration that warrant the level of deference afforded by the District Court. DMLR agreed to that interpretation in exchange for VMIG's dismissal of its lawsuit. VMIG Settlement, JA 364. DMLR has never memorialized its interpretation that the old "transient/ aggregate" approach continues to apply to its newer TMDLs that contain individual WLAs in an official agency guidance document, much less a formal regulation that is the product of notice and comment rulemaking. Such an agency interpretation is due very little deference. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); Mead, 533 U.S. at 228 (explaining that the Supreme Court has expressed "near indifference" to interpretations advanced for the first time in litigation); Granutec, Inc. v. Shalala, 139 F.3d 889, *9 (Table) (4th Cir. 1998) (explaining that "positions adopted by an agency solely for litigation do not deserve the deference of this Court"); United States v. Hoechst Celanese Corp., 128 F.3d 216, 223 n.5 (4th Cir.

1997) (giving no deference to an interpretation of a regulation embodied in an affidavit submitted by a former agency employee on behalf of the defendant in an enforcement action years after issuance of the regulation).

The level of deference that DMLR's interpretation deserves is further weakened by the fact that it conflicts with the position taken by EPA, which is the federal agency that Congress tasked with overseeing implementation of the Clean Water Act. When faced with conflicting interpretations involving a state's implementation of a federal regulatory regime, courts should defer to the federal agency that Congress entrusted with oversight authority. Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1495 (9th Cir. 1997) ("A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under Chevron . . . .")); United States v. Duke Energy Corp., 981 F. Supp. 2d 435, 454–55 (M.D.N.C. 2013) (finding that the interpretation of the U.S. EPA trumps that of the state regulatory agency when determining the meaning of a State Implementation Plan submitted by the state and approved by EPA pursuant to the Clean Air Act); United States v. Ford Motor Co., 736 F. Supp. 1539, 1549–50 (W.D. Mo. 1990) (refusing to defer to a state agency's finding that the defendant was in compliance with a Clean Air Act State Implementation Plan where U.S. EPA disagreed); United States v. S. Indiana Gas & Elec. Co., No. IP99-1692-CMF, 2002 WL 1760699, at *3-4 (S.D. Ind. July 26,

2002) (Deferring to U.S. EPA's interpretation of a Clean Air Act State Implementation Plan over the state's and explaining that "the SIP became <u>federal</u> law, not <u>state</u> law, once EPA approved it, and could not be changed unless and until EPA approved any change. Consequently, the state's interpretation of the regulations incorporated into the SIP, even if binding as a matter of state law, is not directly dispositive of the meaning of the SIP." (emphasis in original)). Here, EPA made clear in its revisions to the draft TMDL and in its Decision Rationale that the TMDL's individual WLAs were required to "be effective and implemented by the Division of Mined Land Reclamation (DMLR) through the NPDES permit program" and that DMLR could "not ignore the WLA[s]." EPA Rationale, JA 413; EPA Revisions, JA 487. DMLR's interpretation directly conflicts with EPA's statements because it looks only to the "aggregate" WLA and ignores the TMDL's individual WLAs.

Even absent the conflict with EPA, DMLR's <u>post hoc</u> interpretation of a permit that it issued should not be afforded the same level of deference as an agency's interpretation of a statute that it administers or a regulation that it has promulgated. The Court of Appeals for the First Circuit explained that the cases mandating deference to agency interpretations of statutes and regulations

> reflect the common sense intuition that an agency is more likely than a court to know what its own regulations mean, as well as the legal inference that Congress, delegating authority to an agency to promulgate such regulations, likely intended a degree of "deference."

> However, neither the language nor the reasoning of those cases suggests they require similar deference to the agency's interpretation of a contract that it makes with an outside party, or, for the same reasons, to a Permit that bears all the earmarks of a contract.

Meadow Green-Wildcat Corp. v. Hathaway, 936 F.2d 601, 605 (1st Cir. 1991).

Such deference is particularly inappropriate where, as here, the agency's interpretation "would seem to work at cross-purposes with Congress's likely statutory intent." Id.; see also Son Broad., Inc. v. United States, 52 Fed. Cl. 815, 823 (2002) (citing Hathaway and refusing to afford deference to U.S. Forest Service's interpretation of a special use permit issued by the agency).

### b. DMLR's Interpretation is Not Due Deference as a Finding of Fact Within the Agency's Technical Expertise

The District Court afforded DMLR's interpretation "special deference" as a product of the agency's "particular technical expertise," citing Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs, 674 F. Supp. 2d 783, 801 (S.D. W. Va. 2009). Op. and Order, JA 519. That case, however, involved deference to an agency's highly technical, scientific findings of fact. See also Reynolds Metals Co. v. U.S. E.P.A., 760 F.2d 549, 558–59 (4th Cir. 1985) (explaining that deference is due for an agency's factual findings regarding "technological and scientific issues").

In contrast, interpretation of Red River's NPDES permit is a purely legal question. See Citizens for Pennsylvania's Future v. Pittsburgh Water and Sewer Authority, 13 F. Supp. 3d 493, 499 (W.D. Pa. 2014) (The meaning of a condition

30

in an NPDES permit is a question of law for the courts to decide.); California Public Interest Research Group v. Shell Oil Co., 840 F. Supp. 712, 716 (N.D. Cal. 1993); Student Public Interest Research Group v. AT & T Bell Laboratories, 617 F. Supp. 1190, 1205 (D.N.J.1985).  Determining the legal meaning of Red River's NPDES permit and the TMDL with which it mandates compliance does not require DMLR's technical expertise. The factual question of whether Defendant is discharging TDS and TSS in excess of its individual WLAs is not in dispute. Nor has SAMS challenged the technical calculations that led to the development of the TMDL's individual WLAs. Rather, the only dispute is whether the permit requires compliance with those WLAs.  The federal courts are at least as competent as the DMLR to answer that purely legal question. Precon Dev. Corp. v. U.S. Army Corps of Engineers, 633 F.3d 278, 296–97 (4th Cir. 2011) (finding that because the Corps' factual findings were not in dispute and the agency had not set forth its legal interpretation in a formal manner, the agency's legal conclusions were entitled at most to Skidmore deference). The District Court thus erred by affording DMLR's interpretation the level of deference appropriate for highly technical, scientific findings of fact.

### III. The Unambiguous Language of Red River's Permit and the South Fork Pound River TMDL Mandate Compliance With The TMDL's Individual WLAs

When assessing the meaning of an NPDES permit, the "starting point, of course, is the text of the permit itself." Ohio Valley Environmental Coalition, Inc. v. Marfork Coal Co., Inc., 966 F. Supp. 2d 667, 682 (S.D. W. Va. 2013). Courts interpret the terms of NPDES permits according to the principles of contract interpretation. Piney Run Preservation Ass'n v. County Com'rs of Carroll County, MD, 268 F.3d 255, 269 (4th Cir. 2001). "If the language is plain and capable of legal construction, the language alone must determine the permit's meaning." Id. at 270 (quoting FDIC v. Prince George Corp., 58 F.3d 1041, 1046 (4th Cir. 1995)). See also Natural Resources Defense Council, Inc. v. County of Los Angeles, 725 F.3d 1194, 1205 (9th Cir. 2013) ("The fact that the parties dispute a [permit's] meaning does not establish that the [permit] is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." (quoting Klamath Water Users Protective Ass'n. v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999)) (modification in original)).

Red River's NPDES Permit 0081272 includes Condition (n)(3), which mandates that "[t]he discharge of any pollutant(s) from this facility that enters into a water body with an existing and approved Total Maximum Daily Load (TMDL) must be made in compliance with the TMDL and any applicable TMDL

32

implementation plan." NPDES Permit Conditions, JA 378. The South Fork Pound

River TMDL has been in existence in some form since April 8, 2010 and in its

current amended form since April 12, 2011. TMDL, JA 29. It has been approved

by EPA since April 28, 2011. EPA Rationale, JA 398. Because the South Fork

Pound River TMDL has been "existing and approved" at the time of all discharges

at issue in this action, the plain language of Condition (n)(3) requires those

discharges to comply with the TMDL.

For point source dischargers such as Red River, "compliance with the

TMDL" can only mean compliance with the TMDL's WLAs. By law, TMDLs

address point source pollution by setting numeric WLAs for each source. 40 C.F.R

§ 130.2(i); Anacostia Riverkeeper, Inc. v. Jackson, 798 F. Supp. 2d 210, 248–49

(D. D.C. 2011). Such WLAs "constitute a type of water quality-based effluent

limitation." 40 C.F.R § 130.2(h). The South Fork Pound River TMDL expressly

states that "[a]ll Waste Load Allocations in this TMDL will be effective and

implemented by DMLR." TMDL, JA 43; see also id., JA 197 ("DMLR's joint

SMCRA/NPDES permits are made consistent with approved coalfield TMDLs.").

Similarly, EPA in approving the TMDL explained that "[i]n this TMDL, all

WLAs will be effective and implemented by the Division of Mined Land

Reclamation (DMLR) through the NPDES permit program" and that the "WLAs

are water-quality based limits." EPA Rationale, JA 413. EPA made clear that

"[o]nce the phased [TSS] and TDS TMDLs for the Pound River watershed have been approved by EPA, measures must be taken to reduce pollution levels from both point and [non-point sources]." Id.

Indeed, the cover letter for Defendant's permit states explicitly that "[p]ermits with NPDES discharges located in Total Maximum Daily Load (TMDL) watersheds are required to discharge in accordance to mining waste load allocations set forth in the appropriate TMDL report for the watershed as stated in the standard NPDES Conditions." NPDES Permit 0081272, JA 384 (emphasis added). By requiring compliance with the TMDL, Condition (n)(3) thus unambiguously requires compliance with the WLAs in the South Fork Pound River TMDL. Under contract interpretation principles, that is the end of the matter. Because Red River's NPDES permit unambiguously requires compliance with the individual wasteload allocations in the South Fork Pound River TMDL, the District Court should not even have considered the DMLR affidavits submitted in support of Defendant's Motion for Summary Judgment.

## IV.     DMLR's Interpretation of Condition (n)(3) and the TMDL Is Unreasonable

As explained above, because the language of Condition (n)(3) and the South Fork Pound River TMDL is plain and capable of legal construction, the Court need not look to any other sources to determine their meaning. However, assuming arguendo that the permit and TMDL are ambiguous and applying a high level of

34

deference to DMLR's interpretation, that interpretation must be rejected as unreasonable.

Defendant and DMLR's interpretation is directly at odds with the plain language of Condition (n)(3), the plain language of the TMDL as approved by EPA, and the requirements of the Clean Water Act. "Because the agency's interpretation of the permit is contrary to the permit's plain language, the agency should not be accorded deference." Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc., 20 F. Supp. 2d 700, 711 (D. Del. 1998), aff'd sub nom., Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc., 182 F.3d 904 (3d Cir. 1999)

> a.  DMLR's Interpretation Renders Portions of Condition (n)(3) and the TMDL's Individual WLAs Meaningless

"[A] court must give effect to every word or term in an NPDES permit and reject none as meaningless or surplusage. . . ." County of Los Angeles, 725 F.3d at 1206 (citing In re Crystal Props., Ltd., L.P., 268 F.3d 743, 748 (9th Cir. 2001)). "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Id. (quoting Restatement (Second) of Contracts § 203(a) (1981)).

DMLR's interpretation of Permit 0081272 completely ignores the fact that the TMDL with which the permit requires compliance contains numeric individual wasteload allocations specifically assigned to that permit. Instead of applying the

individual WLAs included in its newer coalfield TMDLs, as mandated by U.S. EPA, DMLR asserts that it continues to employ the old "transient/aggregate" approach for TMDL coalfield watersheds. O'Quinn Declaration, JA 449–50. Under that approach, a permittees' discharges are measured not against the individual WLAs assigned to each permit in the TMDL, but rather "mining wasteloads are monitored and tracked against the <u>total</u> wasteload allocations assigned in the TMDL." <u>Id.</u> (emphasis added).  Even if the permittee exceeds the WLA for the entire watershed, it has not violated its permit, but must only conduct additional monitoring and implement unspecified "best management practices" (BMPs) to "maintain and/or reduce actual loads." <u>Id.</u> If, based on some unspecified criteria, DMLR determines that additional reductions are needed, it may, but is not required to, mandate additional actions such as more monitoring or BMPs. <u>Id.</u> At no point in that process does DMLR so much as reference the TMDL's permit-specific individual WLAs. DMLR's interpretation thus renders the individual WLAs surplusage.

Likewise, DMLR's interpretation renders meaningless Condition (n)(3)'s command that discharges in TMDL watersheds be "in compliance" with the TMDL. Pursuant to DMLR's "transient/aggregate" approach, permittees' discharges are never required to be "in compliance" with any end of pipe limitation. Indeed, DMLR does not even require the permittee to directly comply

36

with the aggregate WLA for the entire watershed, much less the individual WLAs assigned to each permit in the TMDL.[8] Rather, DMLR's process creates a never-ending treadmill whereby the agency's only response to extreme levels of pollution is to request additional monitoring and allow the permittee to tinker around the edges by selecting from a list of BMPs that have repeatedly proven ineffective to remedy the underlying problem. The idea that "compliance with the TMDL" can be achieved merely by choosing from a list of BMPs, regardless of the levels of pollution being discharged to the watershed, is not found anywhere in the text of Red River's NPDES permit.  The end result of this flawed, counter-textual approach is that DMLR considers Red River to be in compliance with its permit despite the fact that its TDS discharges exceed not only its individual WLAs but also the maximum acceptable load established in the TMDL for the entire South Fork Pound River watershed. Supra at 21–22.

DMLR's "interpretation" of the individual WLAs in the South Fork Pound River TMDL and Condition (n)(3)'s mandate that discharges be made "in compliance with the TMDL"  gives those provisions no meaning or impact whatsoever. It is thus unreasonable and not deserving of any deference.

---

[8] Nor does it appear to contemplate citizen enforcement actions of Condition (n)(3) at all, regardless of the level of discharges. See O'Quinn Declaration, JA 449 ("If the permittee fails to implement those actions or comply with the schedule, then DMLR has the right to initiate an enforcement action against the permittee." (emphasis added)).

b.    DMLR's Interpretation Conflicts with the CWA's
Requirements for Both TMDLs and NPDES Permits

DMLR's "transient/aggregate" approach cannot be squared with the CWA's

requirements for TMDLs. Under EPA regulations, all TMDLs are required to

include individual wasteload allocations. See 40 C.F.R. §§ 130.2(i), 130.2(h). The

District Court for the District of Columbia in Anacostia Riverkeeper discussed at

length the importance of including individual WLAs in every TMDL to the

ultimate goal of preventing violations of water quality standards:

> Total pollutant loads established by a TMDL are incorporated into the
> NPDES permit system, which is a key step in the enforcement of
> those load limits. Absent specification of WLAs for individual point
> sources in the TMDL, therefore, the task of breaking down the total
> pollutant load—represented by a single number—into individual
> allocations is effectively delegated to NPDES permit writers. To the
> extent multiple permit writers oversee a single water body, such
> delegation risks either failure to implement the TMDL through
> overly-generous individual allocations that, in the aggregate, exceed
> total load limits, or over-enforcement of the TMDL through the
> setting of unnecessarily harsh individual allocations developed out of
> fear of under-enforcement. To minimize these risks, EPA reasonably
> determined that specific WLAs should be developed at the stage when
> both the State and the Agency are evaluating the health of an entire
> water body— *i.e.,* when developing the TMDL—because the
> designers of the TMDL can more easily take into account all point
> sources and attempt to divvy up acceptable pollution levels among
> them.

798 F. Supp. 2d at 249–50; accord American Farm Bureau Federation v. U.S.

E.P.A., 984 F. Supp. 2d 289, 318–22 (M.D. Pa. 2013). Individual WLAs are thus

essential for proper TMDL implementation because they allow the permitting

38

agency to ensure that the combined discharges of multiple individual permittees do not exceed the aggregate load for the watershed.

Applying the "transient/aggregate" approach to assess each permittee's discharges against only the total WLA for the watershed entirely nullifies the individual WLAs required by EPA's regulations. That approach realizes EPA's fear of NPDES permits including "overly-generous individual allocations that, in the aggregate, exceed total load limits." Anacostia Riverkeeper, 798 F. Supp. 2d at 249.

Moreover, interpreting Red River's permit under the DMLR's "transient/aggregate" approach would render that permit illegal under the CWA's NPDES requirements. Under the Act, all NPDES permits must include any conditions necessary to achieve water quality standards. 40 C.F.R. § 122.44(d)(1); 40 C.F.R. § 122.4(d).  As explained above, TMDLs and the wasteload allocations therein are set at the levels necessary to ensure that water quality standards can be attained. Supra at 6–9. Accordingly, in order to protect against violations of water quality standards, all NPDES water quality-based effluent limits must be "consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 C.F.R. 130.7." 40 C.F.R. 122.44(d)(1)(vii)(B); see also id., § 130.2(h) (defining WLAs as "a type of water quality-based effluent limitation").

As the Court of Appeals for the D.C. Circuit has explained, "[o]nce approved by EPA, TMDLs must be incorporated into permits allocating effluent discharges among all pollution sources, including point sources (like factories) and non-point sources (like storm-water run-off). . . . If pollution loads stay below the applicable TMDLs for a given body of water, then in theory the body of water should achieve its water quality standards." Friends of Earth, Inc. v. E.P.A., 446 F.3d 140, 143 (D.C. Cir. 2006); see also Dioxin/Organochlorine Ctr. v. Clarke, 57 F.3d 1517, 1520 (9th Cir. 1995) ("When a TMDL and specific wasteload allocations for point sources have been established, any NPDES permits issued to a point source must be consistent with the terms of the TMDL and WLA.").

Under DMLR's interpretation, each individual permittee's loads are measured only against the aggregate load for the entire watershed and even then are not required to directly comply with that load. Viewing each individual permittee's discharges only in reference to the total WLA for the watershed effectively ensures that the TMDL will not be achieved, and that water quality standards in the TMDL watersheds will continue to be violated.  Such an interpretation is contrary to the CWA's requirements that all NPDES permits ensure protection of water quality standards. An interpretation of Red River's NPDES permit that renders the permit illegal is unreasonable and must be rejected. See County of Los Angeles, 725 F.3d at 1207 ("We must interpret the provisions

40

of the Permit like any other contract and reject an interpretation that would render the Permit unenforceable."); Walsh v. Schlecht, 429 U.S. 401, 408, 97 S. Ct. 679, 50 L. Ed. 2d 641 (1977) (noting that "contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable").

          c.     DMLR's Interpretation Nullifies Important EPA Oversight Functions

Not only would DMLR's interpretation render the South Fork Pound River TMDL and Defendant's NPDES permit illegal under the CWA, it would also undermine the process by which EPA reviews and approves state-promulgated TMDLs and NPDES permits. States are required to submit all TMDLs, including the mandatory individual WLAs and the calculations on which they are based, to EPA for review and approval. 40 C.F.R. § 130.7(d). In American Farm Bureau Federation v. U.S. E.P.A., 984 F. Supp. 2d 289 (M.D. Pa. 2013), the court upheld EPA's regulations requiring that TMDLs include individual wasteload allocations and found that the regulations did not unlawfully usurp the state's authority to implement TMDLs. In upholding EPA's regulations, the court relied on EPA's statement that

> it is impossible to evaluate whether a TMDL is technically sound and whether it will be able to achieve standards without evaluating component WLAs and LAs and how these loads were calculated. Thus, it is necessary for EPA to review and approve or disapprove a TMDL in conjunction with component WLAs and LAs.

Id. at 317 (quoting 50 Fed. Reg. 1775 (Jan. 11, 1985)); see also id. at 321 ("The regulations provide that a TMDL include allocations to point and, if necessary, non-point sources of pollution, rather than be devised at a later stage of post-TMDL implementation."). It went on to explain that if states wish to adjust WLAs after EPA approval, they must revise and again submit the TMDL for EPA review. "An alternative scenario, where states retain the flexibility to change the allocations as they see fit, would render the TMDL allocations essentially meaningless." Id. at 328.

Here, EPA mandated that the TMDL include individual daily and annual WLAs and required those WLAs to be implemented in NPDES permits. EPA's revisions to DMME's draft Pound River TMDL made absolutely clear that the TMDL must include effective individual WLAs. Supra at 15–17. EPA was explicit that the individual WLAs "must be implemented" and that DMME could "not ignore the WLA until the revised TMDL." EPA Revisions, JA 487. Allowing DMLR to change the meaning of the TMDL after EPA approval, such that the TMDL's individual WLA are ignored and not implemented, through a private settlement agreement that was not subject to review by EPA completely undermines EPA's oversight authority. If DMLR wishes to modify the assumptions and requirements of the TMDL, it must revise the TMDL and re-submit it to EPA for approval, as required by the CWA. American Farm Bureau

Federation, 984 F. Supp. 2d at 328 ("[T]he TMDL framework anticipates future modifications which can originate from either EPA or the states. That EPA gets final approval makes sense, given that EPA had final approval over the original allocations during the drafting process outlined and approved above.").

Just as DMLR's informal, post hoc interpretation cannot modify the TMDL, neither can it alter the meaning of Red River's NPDES permit. Under the CWA's cooperative federalism scheme, states must submit NPDES permit applications and draft permits to EPA for review. 33 U.S.C. § 1342(d); 40 C.F.R. § 123.43(a). EPA has the right to comment upon or object to a state's permit. Id., §§ 123.44(a), (b). If the state does not alter the permit to meet EPA's objection, authority to issue the permit transfers from the state to the EPA. Id., § 123.44(h). After an NPDES permit is issued, its substantive conditions may only be changed through a major modification[9] of the permit, which requires the preparation of a draft permit, public notice, opportunity for comment, and submittal to EPA for review.  40 C.F.R. § 122.62; 33 U.S.C. § 1342(d). These procedures "ensure that the standards embodied in an NPDES permit cannot be evaded with the cooperation of compliant state regulatory authorities."  Citizens for a Better Environment-

---

[9] Major modifications are any modifications that do not fall within the narrow definition of "minor modification," which includes things like correcting typographical errors, requiring more frequent monitoring, and allowing for a change in ownership of a facility. See 40 C.F.R. § 122.63.

California v. Union Oil Co. of California, 83 F.3d 1111, 1120 (9th Cir. 1996)

("UNOCAL"), cert. denied, 519 U.S. 1101 (1997).

The NPDES permit that was issued to Red River and reviewed by EPA mandates "compliance with the TMDL." The permit's cover page expressly states that the permit's discharges to TMDL watersheds must be made "in accordance with mining waste load allocations set forth in the appropriate TMDL report for the watershed as stated in the standard NPDES Permit Conditions." NPDES Permit 0081272, JA 384. DMLR may not fundamentally alter the requirements of that permit through a private settlement agreement and an affidavit submitted in a citizen enforcement action. DMLR's actions do not come close to satisfying the required federal procedures for a major modification. Because DMLR failed to follow the required procedures to modify Red River's permit, its post hoc interpretation cannot alter meaning of that permit.  United States v. Smithfield Foods, Inc., 191 F.3d 516, 524, 526 (4th Cir. 1999).

**CONCLUSION**

The plain language of Red River's NPDES permit and the South Fork Pound River TMDL require compliance with the TMDL's permit-specific individual wasteload allocations. Red River is discharging harmful amounts of TDS and TSS pollution far in excess of its permit requirements. SAMS requests that the Court issue appropriate declaratory and injunctive relief finding that Red River is in

44

ongoing violation of its permit and ordering Red River to comply with the individual wasteload allocation incorporated into its permit. SAMS requests that the Court remand to the District Court to issue a scheduling order for Phase Two to determine the proper scope of injunctive relief.

## REQUEST FOR ORAL ARGUMENT

Because of the importance and complexity of the issues presented, Plaintiffs-Appellants Southern Appalachian Mountain Stewards, et al., respectfully request oral argument.

Respectfully submitted,

s/ Benjamin A. Luckett
Benjamin A. Luckett
Appalachian Mountain Advocates
PO Box 507
Lewisburg, WV 24901
Phone: (304) 645-0125
Fax: (304) 645-9008
bluckett@appalmad.org

Isak J. Howell
Law Office of Isak Howell
117 E. Washington St., Suite 1
Lewisburg, WV 24901
Phone: (540) 998-7744
Fax: (304) 645-9008
Isak@howell-lawoffice.com

# ADDENDUM

## ADDENDUM OF PERTINENT STATUTES AND REGULATIONS
## TABLE OF CONTENTS

**Page:**

A.    Clean Water Act Statutory Provisions .........................................Add. 1

    1.    33 U.S.C. § 1311. Effluent limitations .............................Add. 1

    2.    33 U.S.C. § 1313. Water quality standards and implementation plans ........................................................Add. 2

    3.    33 U.S.C. § 1342. National pollutant discharge elimination system ............................................................Add. 3

Clean Water Act Regulations...........................................................Add. 4

    1.    40 C.F.R. § 122.4. Prohibitions (applicable to State NPDES programs, <u>see</u> § 123.25) ..............................................Add. 4

    2.    40 C.F.R. § 122.44. Establishing limitations, standards, and other permit conditions (applicable to State NPDES programs, see § 123.25)...................................................................Add. 5

    3.    40 C.F.R. § 130.2. Definitions ........................................Add. 5

    4.    40 C.F.R. § 130.3 Water quality standards ..................................Add. 8

    5.    40 C.F.R. § 130.7. Total maximum daily loads (TMDL) and individual water quality-based effluent limitations ....................Add. 8

# ADDENDUM OF PERTINENT STATUTES AND REGULATIONS

### A.    Clean Water Act Statutory Provisions

### 1.    33 U.S.C. § 1311. Effluent limitations.

(a) Illegality of pollutant discharges except in compliance with law

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

(b) Timetable for achievement of objectives

In order to carry out the objective of this chapter there shall be achieved--

(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title; or,

(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter.

***

## 2.     33 U.S.C. § 1313. Water quality standards and implementation plans.

\*\*\*

(d) Identification of areas with insufficient controls; maximum daily load; certain effluent limitations revision

(1)(A) Each State shall identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters.

\*\*\*

(C) Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

\*\*\*

(2) Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such

waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

\*\*\*

### 3.    33 U.S.C. § 1342. National pollutant discharge elimination system.

(a) Permits for discharge of pollutants

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

\* \* \*

(b) State permit programs

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist . . . .

\* \* \*

(d) Notification of Administrator

(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

## Clean Water Act Regulations

    **1.**    **40 C.F.R. § 122.4. Prohibitions (applicable to State NPDES programs, see § 123.25).**

No permit may be issued:

(a) When the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA;

\*\*\*

(c) By the State Director where the Regional Administrator has objected to issuance of the permit under § 123.44;

(d) When the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States;

\*\*\*

**2.     40 C.F.R. § 122.44. Establishing limitations, standards, and other permit conditions (applicable to State NPDES programs, see § 123.25).**

In addition to the conditions established under § 122.43(a), each NPDES permit shall include conditions meeting the following requirements when applicable.
***

(d) Water quality standards and State requirements: any requirements in addition to or more stringent than promulgated effluent limitations guidelines or standards under sections 301, 304, 306, 307, 318, and 405 of CWA necessary to:

(1) Achieve water quality standards established under section 303 of the CWA, including State narrative criteria for water quality.

***

(vii) When developing water quality-based effluent limits under this paragraph the permitting authority shall ensure that:

(A) The level of water quality to be achieved by limits on point sources established under this paragraph is derived from, and complies with all applicable water quality standards; and

(B) Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7.

**3.     40 C.F.R. § 130.2. Definitions.**

***

(d) Water quality standards (WQS). Provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses. Water quality standards are to protect the public health or welfare, enhance the quality of water and serve the purposes of the Act.

(e) Load or loading. An amount of matter or thermal energy that is introduced into a receiving water; to introduce matter or thermal energy into a receiving water. Loading may be either man-caused (pollutant loading) or natural (natural background loading).

(f) Loading capacity. The greatest amount of loading that a water can receive without violating water quality standards.

(g) Load allocation (LA). The portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources. Load allocations are best estimates of the loading, which may range from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading. Wherever possible, natural and nonpoint source loads should be distinguished.

(h) Wasteload allocation (WLA). The portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation.

(i) Total maximum daily load (TMDL). The sum of the individual WLAs for point sources and LAs for nonpoint sources and natural background. If a receiving water has only one point source discharger, the TMDL is the sum of that point source WLA plus the LAs for any nonpoint sources of pollution and natural background sources, tributaries, or adjacent segments. TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure. If Best Management Practices (BMPs) or other nonpoint source pollution controls make more stringent load allocations practicable, then wasteload allocations can be made less stringent. Thus, the TMDL process provides for nonpoint source control tradeoffs.

(j) Water quality limited segment. Any segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards, even after the application of the technology-based effluent limitations required by sections 301(b) and 306 of the Act.

    ***

(m) Best Management Practice (BMP). Methods, measures or practices selected by an agency to meet its nonpoint source control needs. BMPs include but are not limited to structural and nonstructural controls and operation and maintenance procedures. BMPs can be applied before, during and after pollution-producing activities to reduce or eliminate the introduction of pollutants into receiving waters.

### 4. 40 C.F.R. § 130.3 Water quality standards.

A water quality standard (WQS) defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses. States and EPA adopt WQS to protect public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act (CWA). "Serve the purposes of Act" (as defined in sections 101(a)(2) and 303(c) of the Act) means that WQS should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration their use and value for public water supplies, propagation of fish, shellfish, wildlife, recreation in and on the water, and agricultural, industrial and other purposes including navigation.

Such standards serve the dual purposes of establishing the water quality goals for a specific water body and serving as the regulatory basis for establishment of water quality-based treatment controls and strategies beyond the technology-based level of treatment required by sections 301(b) and 306 of the Act.

### 5. 40 C.F.R. § 130.7. Total maximum daily loads (TMDL) and individual water quality-based effluent limitations.

***

(c) Development of TMDLs and individual water quality based effluent limitations.

(1) Each State shall establish TMDLs for the water quality limited segments identified in paragraph (b)(1) of this section, and in accordance with the priority ranking. For pollutants other than heat, TMDLs shall be established at levels necessary to attain and maintain the applicable narrative and numerical WQS with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality. Determinations of TMDLs shall take into account critical conditions for stream flow, loading, and water quality parameters.

***

(d) Submission and EPA approval.

(1) Each State shall submit biennially to the Regional Administrator beginning in 1992 the list of waters, pollutants causing impairment, and the priority ranking including waters targeted for TMDL development within the next two years as required under paragraph (b) of this section. For the 1992 biennial submission, these lists are due no later than October 22, 1992. Thereafter, each State shall submit to EPA lists required under paragraph (b) of this section on April 1 of every even-numbered year. For the year 2000 submission, a State must submit a list required under paragraph (b) of this section only if a court order or consent decree, or commitment in a settlement agreement dated prior to January 1, 2000, expressly requires EPA to take action related to that State's year 2000 list. For the year 2002 submission, a State must submit a list required under paragraph (b) of this section by October 1, 2002, unless a court order, consent decree or commitment in a settlement agreement expressly requires EPA to take an action related to that State's 2002 list prior to October 1, 2002, in which case, the State must submit a list by April 1, 2002. The list of waters may be submitted as part of the State's biennial water quality report required by § 130.8 of this part and section 305(b) of the CWA or submitted under separate cover. All TMDLs established under paragraph (c) for water quality limited segments shall continue to be submitted to EPA for review and approval. Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State.

(2) The Regional Administrator shall either approve or disapprove such listing and loadings not later than 30 days after the date of submission. The Regional Administrator shall approve a list developed under § 130.7(b) that is submitted after the effective date of this rule only if it meets the requirements of § 130.7(b). If the Regional Administrator approves such listing and loadings, the State shall incorporate them into its current WQM plan. If the Regional Administrator disapproves such listing and loadings, he shall, not later than 30 days after the date of such disapproval, identify such waters in such State and establish such loads for such waters as determined necessary to implement applicable WQS. The Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings. After considering public comment and making any revisions he deems appropriate, the Regional Administrator shall transmit the listing and loads to the State, which shall incorporate them into its current WQM plan.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains 10,713 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.


Dated: October 13, 2015                     /s/ Benjamin A. Luckett
                                            Benjamin A. Luckett

                                            *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 13, 2015, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to the following registered CM/ECF users:

Stephen M. Hodges                    Ryan J. Pedraza
Seth M. Land                         Brooks M. Smith
PENNSTUART                           TROUTMAN SANDERS, LLP
208 East Main Street                 P.O. Box 1122
P.O. Box 2288                        Richmond, VA  23218
Abingdon, VA  24212                  (804) 697-1898
(276) 628-5151

*Counsel for Appellee*                 *Counsel for Appellee*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
206 East Cary Street
P.O. Box 1460 (23218)
Richmond, VA  23219
(804) 249-7770